STEVEN G. KALAR
Federal Public Defender
CANDIS MITCHELL
Assistant Federal Public Defender
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:      415.436.7700
Facsimile:      415.436.7706
candis_mitchell@fd.org

Counsel for Defendant Scott Steever

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **United States of America,** | Case Number: cr 14-00639 EMC |
| Plaintiff, | |
| v. | **Sentencing Memorandum** |
| **Scott Steever,** | Date:   June 28, 2017 |
| Defendant. | Time:  2:30 p.m. |

Scott Steever, through undersigned counsel, respectfully offers the following memorandum in support of his request for a sentence of five years of probation—including one year of home detention.

**1.      Section 3553(a) Analysis**

**1.1.      The Nature and Circumstances of the Offense . . .**

On November 18, 2016, Mr. Steever pled guilty with plea agreement to Counts One and Two of the Indictment charging him with 18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud (Count One) and a violation of 18 U.S.C. 1956(h) – Conspiracy to Commit Money Laundering (Count Two). PSR ¶¶ 1-4. His co-defendant Robert Anderson plead guilty to the same counts on March 9, 2016.

Messrs. Steever and Anderson were both employees with the law firm Lanahan, Steever, and Anderson ("LSA") (formerly Lanahan and Reilly). Ms. Bonnie Margolin and her deceased husband had been clients of the firm since 2004. At the time that Ms. Margolin hired LSA, Messrs. Anderson and Steever were managing partners of LSA.

When Mr. Margolin died in 2009, the firm continued to represent Ms. Margolin in matters and assisted her in managing the proceeds from Mr. Margolin's $500,000 life insurance policy. Ms. Margolin hired LSA to collect life insurance proceeds and hold them in trust until the resolution of certain claims against her deceased husband and his living trust. Ms. Margolin decided to purchase an annuity with $200,000 of the insurance proceeds. The remaining $300,000 would be used to pay debts and expenses related to Mr. Margolin's business ventures. It was anticipated that after the debts were paid, the remainder would be disbursed to Ms. Margolin for living expenses.

On or about August 18, 2009, a check in the amount of $318,903.94 payable to Ms. Margolin was issued by Protective Life Insurance Company. The check was deposited into the LSA Client Trust Account held at American River Bank on or about November 13, 2009. Signatories on the American River Bank account included Daniel Lanahan, Martin Reilly, Mary Demer, Scott Steever, Robert Anderson and Kathryn Marko.

Some expenditures from the funds deposited were approved by Ms. Margolin. But, by November 20, 2009, the balance in the Client Trust Account dropped to $281,390.16 and continued to drop until it reached a balance of $399.05 in March 2010. Between November 13, 2009, and March 2010, there were numerous telephone transfers, automatic debits, internet banking transfers, outgoing and incoming wires,

401(k) accounts payments, and stock purchases from the account. Between November 17, 2009, and February 10, 2010, Mr. Anderson signed 30 checks that were paid out of the funds in the Client Trust Account totaling more than $185,778.64 and authorized one wire transfer for $7,200 on December 15, 2009. Some of these checks were co-signed by Mr. Steever. Mr. Steever signed over a check to Mr. Anderson for $20,700 from the Client Trust Account.  None of these distributions were on behalf of, or for the benefit of Ms. Margolin. Instead, the funds were used to pay salaries and expenses associated with LSA. The account was closed on April 29, 2010.

Ms. Margolin hired separate counsel to demand an accounting of her funds in the Client Trust Account. Her representative, Michael Shiffman, received a purported accounting that showed a trust balance as of February 2012 for $252,511. After Mr. Shiffman discovered that Ms. Margolin's funds were no longer being held in trust by LSA, he attempted to negotiate with Messrs. Anderson and Steever to obtain repayment of the missing funds in August 2012. LSA sent Ms. Margolin a check for $6,500 in October 2012.

In November 2013, Ms. Margolin succeeded in a civil judgment against Messrs. Anderson and Steever finding them jointly and severally liable for a sum of $252,511.53. (Case Number SCV 253533, Superior Court of the State of California, Sonoma County, Margolin v. Steever & Anderson).

In December 2013, LSA made a second payment to Ms. Margolin by cashier's check for $70,000. On information and belief, no further payments have been made to Ms. Margolin.

1  The State Bar initiated proceeding against both Messrs. Anderson and Steever in April 2014.

2  Because of the findings of the State Bar, Mr. Steever was disbarred March 27, 2015, Mr. Anderson was

3  deemed not eligible to practice law in California since July 2, 2013.

4  In describing his involvement with the offense, Mr. Steever stated:

'Yes, I accept responsibility. The offense occurred as is outlined in my plea
agreement, utilizing trust fund money to pay firm expenses.' He further
noted he felt 'absolutely terrible' for having committed the offense and it
was a complete lapse of judgment. His actions have financially harmed
Bonnie Margolin, and his consequences have had a direct impact on his
family members. He was influenced to commit the offense due to 'extreme
cash flow problems and Lanahan and Reilly caused by the economic
downturn of 2000-08 and the ultimate failure of the *Nunes v. Viera* (milk
case) contingency which resulted in a huge loss in hourly legal week
productivity, causing a 4 million dollar (plus) in a loan arranged by D.
Lanahan and Martin Reilly to fund the case and case overturn on appeal
($27 million dollar judgment).'

10  PSR ¶ 26.

11

12  **1.2    . . . [And] the History and Characteristics of the Defendant.**

13  Born and raised in the Bay Area, Mr. Steever attended all of his schooling here and later settled in

14  the Rohnert Park area with his wife. PSR ¶¶ 50-51. Together they raised two children to adulthood. PSR

15  ¶ 51. While a Santa Rosa firefighter following his high school graduation, Mr. Steever later returned to

16  college, graduated from Cal State Sonoma, and later attended law school at Golden Gate University.

17  He started working for LSA in 1996 and stayed with the firm until October 2011 when he could no

18  longer work due to his medical conditions and cancer treatments. He was diagnosed with colorectal

19  cancer in November 2011 and underwent treatment and multiple surgeries for his cancer. PSR ¶ 53.

20  Shortly after he had his cancer surgery, he had a small stroke. *Id.* He then had a number of cardiac

21

1   procedures resulting in a pacemaker and stent being inserted. *Id.* He has been unable to work since 2012

2   and has been on medical disability since.

3       Mr. Steever's medical treatment has been ongoing and continuous since his initial diagnosis. PSR

4   ¶ 52-53. His doctor recently submitted a letter indicating his most recent round of medical treatment and

5   care. *See* Exhibit A.

6       Prior to Mr. Steever suffering from his debilitating medical issues, he was a board member of a

7   non-profit recovery home for juveniles with drug and alcohol issues. *See* Exhibit B. He also worked for a

8   number of charities in the Sonoma County area. One of his friends writes of Mr. Steever and his

9   circumstances:

10
11  > I feel that he has been candid with me about these circumstances and I think that he has handled the situation in a "stand up" manner. He has been humble, while suffering public scorn and has maintained his dignity with those who care about him.

12
13  > During this time I have been amazed with how he has dealt with the situation while dealing with incredible health issues. Frankly most of us are amazed that he is still alive. He has survived when few thought that he could.

14  Exhibit B.

15      Another writes that he considered Mr. Steever's actions be to a departure for his character. *See* Exhibit C.

16
17      **1.3**    **The Need for the Sentence Imposed.**

18          **1.3.1**    **To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense; To Afford Adequate Deterrence;**

19

20

21
Def. Sent. Memo.
cr 14-00639 EMC           5

1    The requested sentence is significantly tailored to Mr. Steever and, thus, reflects the seriousness of

2    the offense, promotes respect for the law, provides just punishment for the offense, and serves as an

3    adequate deterrence to criminal conduct.

4    While a variance from the standard sentence imposed in this type of case, the requested sentence

5    will be a specific deterrent to Mr. Steever as the continued supervision he will incur while after serving his

6    sentence will serve as a great hindrance on any temptation to continue in illegal activity.

### 1.3.2   To Protect the Public from Further Crimes of the Defendant; and

8    As Mr. Steever is permanently barred from future employment as an attorney, he will not be in a

9    position where he can commit a similar offense. Additionally, Mr. Steever will have a lengthy period while

10   on supervision following the conclusion of his case. This period of supervision will offer protection to the

11   public.

12   Mr. Steever's involvement in this offense has resulted in great personal and professional

13   punishment to him. His involvement in this case, has resulted in the loss of his professional license and

14   his ability to earn funds as a lawyer as well as civil and criminal charges. When he was working as an

15   attorney, he was the main breadwinner for his family and his currently financial condition reflects the

16   precarious financial situation his family currently finds themselves. Notably, his illegal actions were not

17   undertaken solely for personal enrichment, rather they were undertaken in a misguided attempt to sustain

18   a law firm that had over-extended itself and placed its financial stability on the returns from one case.

19   Mr. Steever's professional and financial ruin is similar to United States District Judge Robert P.

20   Aguilar, who received a downward departure in his own case because he had been severely punished by

21

the investigation of his conduct, criminal charges, disbarment, and impeachment. *United States v. Aguilar*, 994 F.2d 609, 643-45 (9th Cir. 1993)(additional professional punishment a basis for departure).

### 1.3.3   To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.

As detailed above, Mr. Steever has a number of medical issues that are the driving force in a recommendation for a reduced sentence. In this case, Mr. Steever suffers from:

- Abdominal aortic aneurysm
  - An abdominal aortic aneurysm is an enlarged area in the lower part of the aorta, the major blood vessel that supplies blood to the body. The aorta, about the thickness of a garden hose, runs from the heart through the center of the chest and abdomen. Because the aorta is the body's main supplier of blood, a ruptured abdominal aortic aneurysm can cause life-threatening bleeding. Depending on the size and the rate at which the abdominal aortic aneurysm is growing, treatment may vary from watchful waiting to emergency surgery. Once an abdominal aortic aneurysm is found, doctors will closely monitor it so that surgery can be planned if it's necessary. Emergency surgery for a ruptured abdominal aortic aneurysm can be risky.[1]
- Adenocarcinoma, rectum
  - A type of cancer that starts in the glands that line the inside of one of the organs.[2]
- Angina
  - Angina is chest pain or discomfort caused when the heart muscle does not get enough oxygen-rich blood. It may feel like pressure or squeezing in the chest. The discomfort also can occur in the shoulders, arms, neck, jaw, or back. Angina pain may even feel like indigestion. It is a symptom of an underlying heart problem, usually coronary heart disease (CHD).[3]
- Atherosclerosis of aorta
  - Atherosclerosis is a major cause of abdominal aortic aneurysm and is the most common kind of arteriosclerosis, or hardening of the arteries. This disease process can be seen in any

---

[1] http://www.mayoclinic.org/diseases-conditions/abdominal-aortic-aneurysm/home/ovc-20197858

[2] http://www.webmd.com/colorectal-cancer/what-is-adenocarcinoma#1

[3] http://www.heart.org/HEARTORG/Conditions/HeartAttack/DiagnosingaHeartAttack/Angina-Chest-Pain_UCM_450308_Article.jsp#.WUsqg_nyuCg

blood vessel in the body and is the cause of coronary artery disease, stroke, and peripheral arterial disease (PAD).[4]

- Atrial fibrillation, paroxysmal
  - Atrial fibrillation (AF) is the most common arrhythmia, affecting more than 4% of the population over the age of 60. AF can be divided into permanent and paroxysmal atrial fibrillation (PAF). PAF is defined as at least two separate episodes of AF that terminate spontaneously in less than 7 days, usually within 24 hours. The risk of PAF progressing to permanent AF increases with time. [5]
- AV bock, complete
  - Third-degree atrioventricular (AV) block, also referred to as third-degree heart block or complete heart block, is a disorder of the cardiac conduction system where there is no conduction through the atrioventricular node (AVN). Therefore, complete dissociation of the atrial and ventricular activity exists.[6]
- Coronary artery disease, with a stent
  - Coronary artery disease, also called coronary heart disease, or simply, heart disease, affects millions of Americans. This serious condition is a result of plaque buildup in the arteries. Stents are small, expandable tubes that treat narrowed arteries in the body. In people with coronary heart disease caused by the buildup of plaque, they can:
    - Open narrowed arteries
    - Reduce symptoms, like chest pain
    - Help treat a heart attack
- CKD, stage 3
  - A person with stage 3 chronic kidney disease (CKD) has moderate kidney damage. This stage is broken up into two: a decrease in glomerular filtration rate (GFR) for Stage 3A is 45-59 mL/min and a decrease in GFR for Stage 3B is 30-44 mL/min. As kidney function declines waste products can build up in the blood causing a condition known as "uremia." In stage 3, a person is more likely to develop complications of kidney disease such as high blood pressure, anemia (a shortage of red blood cells) and/or early bone disease.[7]
- Drug induced polyneuropathy
  - Damage to nerves of the peripheral nervous system caused by a chemical substance used in the treatment, cure, prevention or diagnosis of a disease.[8]
- Essential HTN

---

[4] http://www.umcvc.org/conditions-treatments/arteriosclerotic-aortic-disease

[5] http://www.medpagetoday.com/resource-center/atrial-fibrillation/Paroxysmal-Atrial-Fibrillation-Diagnosis-Progression-Stroke-Risk/a/32419

[6] http://emedicine.medscape.com/article/162007-overview

[7] https://www.davita.com/kidney-disease/overview/stages-of-kidney-disease/stage-3-of-chronic-kidney-disease/e/4749

[8] http://onlinelibrary.wiley.com/doi/10.1111/bcpt.12261/pdf

- o Essential hypertension is high blood pressure that does not have a known secondary cause. It is also referred to as primary hypertension.[9]
- GI hemorrhage
  - o Gastrointestinal (GI) bleeding is when bleeding occurs in any part of the gastrointestinal tract. The GI tract includes the esophagus, stomach, small intestine, large intestine (colon), rectum, and anus. GI bleeding itself is not a disease, but a symptom of any number of conditions.[10]
- Heart failure with function less than 50%
  - o A healthy heart pumps blood throughout the body to make sure it gets all the blood and oxygen it needs. Over time, if there is heart failure, the heart cannot give the body everything it needs. The heart might try to make up for it by enlarging, getting more muscle, or pumping faster. Blood vessels may get narrower, and the body may even stop sending blood to the less important organs and tissues.[11]
- History of CABG
  - o Coronary artery bypass grafting (CABG) is defined as "open-heart surgery in which a section of a blood vessel is grafted from the aorta to the coronary artery to bypass the blocked section of the coronary artery and improve the blood supply to the heart."[12]
- History of rectal cancer
  - o Rectal cancer is a disease in which malignant (cancer) cells form in the tissues of the rectum.[13]
- Hyperlipidemia
  - o An abnormally high concentration of fats or lipids in the blood. Also known as high cholesterol[14]
- Ischemic stroke
  - o Ischemic strokes occur because of an obstruction within a blood vessel supplying blood to the brain. The underlying condition for this type of obstruction is the development of fatty deposits lining the vessel walls. This condition is called atherosclerosis.[15]
- Left and Right carotid artery stenosis
  - o Carotid stenosis is a narrowing of the carotid arteries, the two major arteries that carry oxygen-rich blood from the heart to the brain. Also called carotid artery disease, carotid

[9] http://www.healthline.com/health/essential-hypertension#overview1

[10] http://www.emedicinehealth.com/gastrointestinal_bleeding/article_em.htm

[11] http://www.webmd.com/heart-disease/heart-failure/what-is-heart-failure#1

[12] https://www.hindawi.com/journals/srp/2014/726158/

[13] https://www.cancer.gov/types/colorectal/patient/rectal-treatment-pdq

[14] http://www.webmd.com/cholesterol-management/hyperlipidemia-overview#1

[15] http://www.strokeassociation.org/STROKEORG/AboutStroke/TypesofStroke/IschemicClots/Ischemic-Strokes-Clots_UCM_310939_Article.jsp#.WUsuGvnyuCg

stenosis is caused by a buildup of plaque (atherosclerosis) inside the artery wall that reduces blood flow to the brain.[16]

- Major depressive disorder
  - o A person who suffers from a major depressive disorder (sometimes also referred to as clinical depression or simply depression) must have either a depressed mood or a loss of interest or pleasure in daily activities consistently for at least a two-week period. This depressed mood must represent a significant change from the person's normal mood. Social, occupational, educational, or other important functioning must also be negatively impacted by the change in mood. [17]
- Monoclonal gammopathy of undetermined significance
  - o Monoclonal gammopathy of undetermined significance (MGUS) is a condition in which an abnormal protein — known as monoclonal protein or M protein — is in the blood. MGUS usually causes no problems. But sometimes it can progress over years to other disorders, including some forms of blood cancer.[18]
- Obstructive sleep apnea
  - o Obstructive sleep apnea happens when something partly or completely blocks the upper airway during shut-eye. That makes the diaphragm and chest muscles work harder to open the obstructed airway and pull air into the lungs. Breathing usually resumes with a loud gasp, snort, or body jerk. You may not sleep well, but you probably will not be aware that this is happening. The condition can also reduce the flow of oxygen to vital organs and cause irregular heart rhythms.[19]
- Parastomal hernia
  - o A parastomal hernia is a type of incisional hernia allowing abdominal contents to protrude through an abdominal wall defect in the stoma. A stoma or ostomy is a surgically created opening accessible at the skin level of the abdomen allowing stool or urine to leave the body.[20]
- Postoperative ileus
  - o Postoperative ileus is a malfunction of intestinal motility after major intra-or extra-abdominal surgery. Postoperative ileus affects many patients undergoing bowel resection surgery, can cause significant discomfort, and prolongs the hospital stay.[21]
- Solitary bone cyst

---

[16] https://www.mayfieldclinic.com/PE-CarotidStenosis.htm

[17] https://psychcentral.com/disorders/depression/depression-symptoms-major-depressive-disorder/

[18] http://www.mayoclinic.org/diseases-conditions/mgus/home/ovc-20199535

[19] http://www.webmd.com/sleep-disorders/guide/understanding-obstructive-sleep-apnea-syndrome#1-1

[20] http://surgery.ucsf.edu/conditions--procedures/parastomal-hernia.aspx

[21] http://www.medpagetoday.com/pdf/MEVH04/pages.cfm?section=02-overview.cfm

- - A unicameral bone cyst, also known as a simple bone cyst, is a cavity filled with a yellow-colored fluid. It is considered benign since it does not spread beyond the bone.[22]
- Urinary retention
  - Urinary retention, also known as ischuria or bladder failure, is an inability to completely empty the bladder. It is a common complication of benign prostatic hyperplasia (BPH).[23]
- Vitamin B12 deficiency

Mr. Steever's numerous conditions are analogous to those found in *United States v. Rabins*, 63 F.3d 721 (8th Cir.1995), where the court noted a downward departure for advancing disease may be warranted, and to *United States v. Schein*, 31 F.3d 135 (3rd Cir. 1994), where a downward departure for both HIV+ and other serious conditions was approved.

The BOP is responsible for confining offenders in environments that are safe, humane, cost-efficient, and appropriately secure. As part of this mission, the BOP provides medical care to federal inmates. Federal inmates receive medical care through institution health units or outside medical providers.

As a result, it might be tempting to assume that the BOP could easily provide for Mr. Steever as the Bureau of Prisons handles inmates whose medical conditions are stable as any other inmate. However, if an individuals' medical condition is not stable, or they have multiple medical issues—both of which apply to Mr. Steever—they he would be sent to a prison medical facility, such as Springfield, Missouri, or Butner, North Carolina. Because of the varied nature of the security levels of the individuals in the facility, some employ more stringent security levels than would otherwise be applicable to Mr. Steever. These more stringent security levels would result in a higher degree of confinement. Otherwise, were Mr. Steever

---

[22] https://en.wikipedia.org/wiki/Unicameral_bone_cyst

[23] https://en.wikipedia.org/wiki/Urinary_retention

Def. Sent. Memo.
cr 14-00639 EMC                                                11

stable, he would likely be designated to a camp-type low security facility. In *United States v. Charry Cubillos*, 91 F.3d 1342 (9th Cir. 1996), the Ninth Circuit found that a district court could reduce a sentence for a deportable alien because they were ineligible for incarceration at a minimum security facility or community confinement despite otherwise qualifying for less-restrictive placement.

Additionally, due to staffing issues, Mr. Steever could suffer restricted access to quality medical care while incarcerated. In Financial Year 2014, the BOP employed 3,215 medical staff, including 2,382 civil servants and 833 PHS officers, to meet the treatment needs. However, many institutions remain understaffed, limiting the amount of care that an institution can provide. Specifically, in FY 2014, 20 BOP institutions had a medical staff vacancy rate of 25 percent or higher and three institutions had a vacancy rate of 40 percent or higher. [24]

These vacancies could have a detrimental effect on Mr. Steever's health as the Bureau of Prisons has recently implemented primary care provider teams (PCPT). Under the PCPT model, each inmate is assigned to a primary health care provider who will be responsible for managing the inmate's health care needs. The PCPT includes a staff physician, midlevel practitioners, and ancillary staff such as pharmacists, radiology technicians, and lab technicians. Chiefly the midlevel practitioners (physician assistants, nurse practitioners, or unlicensed foreign medical graduates) under the supervision of a staff physician provide the primary health care of the inmates. The staff physicians are generally family practice or internal medicine specialists. They control an inmate's access to specialty medical care and review any

---

[24] Office of the Inspector General. Review of the Federal Bureau of Prisons' Medical Staffing Challenges. March 2016. (https://oig.justice.gov/reports/2016/e1602.pdf)

recommendations made by medical specialists to determine whether they are within the scope of services and policy of the Bureau of Prisons before implementation.

In order for an inmate to receive care or treatment by a specialist, including physical therapy, the midlevel practitioner would have to identify the inmate's medical problem and alert the staff physician who would then decide whether to refer the inmate to a specialist if one is available.

The Bureau of Prisons seeks to obtain medical specialty care for its inmates through contracting with local hospitals. However, contracts with hospitals do not necessarily include services of specialty physicians. In fact, each facility of the Bureau of Prisons uses a variety of procurement practices to establish agreements with both hospitals and individual physicians and other medical specialists for specialty care. The success of establishing those agreements depends on the availability of any particular medical specialist or facility in the community in which the prison is located, the willingness of that provider or facility to travel to the prison and subject him/herself to the security requirements for entrance and the constraints of treating individuals in prison, the willingness of that provider to see inmates in his office/practice/facility, and, increasingly significantly, the ability of that specialty provider to obtain medical malpractice insurance when his or her practice includes inmates.

In order for an inmate to be seen by a medical specialist such as a cardiologist or neurologist outside the facility for a nonemergency condition, an escorted trip must be approved and arranged in advance. The number of correctional officers required for each escorted trip ranges from one to five or more, depending on the characteristics of the inmate involved. Because of staffing limitations, a facility will typically schedule a limited number of escorted trips each day, and generally, the number of inmates

requiring such trips exceeds the number approved daily. As a result, Bureau of Prisons medical staff (generally the clinical director) establishes priorities to determine which inmates should fill the limited number of escorted trip "slots" available. These are clinical decisions based on the director's assessment of acuity. Thus, while an inmate may have received medical approval for specialty consultation/intervention, the delivery of that care depends heavily on the number of escorted trips available and the acuity of his or her condition. The likelihood that an inmate will receive regular escorted trips for medical specialist consultation over an extended period is diminished in light of these logistical variables. It is most likely that at some point the inmate's care, even if approved by the utilization review committee, will be interrupted as an inmate with more acute needs displaces him or her.

In Mr. Steever's case, while out-of-custody he makes frequent visits to the multitude of specialists he sees daily and incarceration would limit his access to qualified medical providers.

**1.4     The Kinds of Sentences Available.**

Here, the maximum sentence the Court may impose for both counts is up to 20 years imprisonment, three years supervised release, five-years probation, a $250,000 fine. Additionally there is a $200 special assessment for all counts combined.

**1.5     The Sentencing Range Established for the Applicable Category of Offense Committed by the Applicable Category of Defendant as Set Forth in the Guidelines**

**1.5.1     Mr. Steever's Proposed Guideline Calculations.**

Base Offense Level, U.S.S.G. § 2S1.1 .......................................................7

Loss Amount, U.S.S.G. § 2B1.1(b)(1)(F)....................................... +10

Role in Offense, U.S.S.G. § 23B1.3 ....................................................+2

Acceptance of Responsibility, USSG § 3E1.1(a) & (b)....................−3

Total Offense Level ...........................................................................17

Criminal History Category ....................................................................I
Sentencing Guideline Range...........................................24-30 months

Government Recommendation.............................................24 months
Probation Officer Recommendation ...................................15 months
Mr. Steever's Recommendation ..............................5 years probation

### 1.5.2   The Court Should Adjust Downward Three-Levels for Acceptance of Responsibility.

Pursuant to U.S.S.G. § 3E1.1, the Court should depart three-levels because Mr. Steever accepted responsibility for his involvement in the present offense.

### 1.6   Any Pertinent Policy Statement.

Addressed above.

### 1.7   Unwarranted Sentencing Disparity.

Mr. Steever's initial involvement in this offense differs from others similarly situated. He is requesting the Court impose a downward variance to account for his physical health.

### 1.8   Restitution.

The parties agree that Mr. Steever should pay restitution as indicated below as part of a money judgment entered into with his co-defendant Robert Anderson that he is jointly and severally liable for a total of $283,689.16 divided as below:

| Name | Amount of Restitution |
| --- | --- |
| J.R. | $45,000 |
| V.A. | $28,000 |

| B.M. | $210,189.16 |
|------|-------------|

Mr. Steever would request that such payments be made without the accrual of interest, pursuant to 18 U.S.C. § 3612 (f)(3) as Mr. Steever does not have the ability to pay the interest and reasonable efforts to collect the interest is not likely to be effective.

**2.      Conclusion**

The facts before the Court establish compelling reasons to impose a sentence below the low-end the Guideline range. Accordingly, Mr. Steever asks the Court to sentence him to a term of 5 years probation. Mr. Steever makes the request for a variance for the following reasons:

1. His age at the time of sentencing;
2. He suffers from a number of infirmities and is vulnerable to various infections;
3. Mr. Steever suffered punishment through the loss his professional livelihood as a result of his actions;
4. Were he incarcerated, it would take place in a federal medical facility result in a higher degree of confinement and security than he otherwise would be subject to; and,
5. Doubts that the Bureau of Prisons could adequately take care of Mr. Steever's continuing medical needs.

Should the Court impose a custodial sentence, Mr. Steever would request that the Court state in the judgment that Mr. Steever should reside at a Level Three or Four Medical Center[25] and that "any

---

[25] Level 1 prisoners are characterized as healthy (overall), requiring only emergency medical care or care that can be managed by clinical evaluations every six months or less; Level 2 prisoners are medically stable, but may have chronic conditions under good control and can manage independently with quarterly status reviews (e.g., an asthma condition controlled by prisoner-held inhaler, or high blood pressure/high cholesterol controlled through medication) that may require quarterly medical evaluations. Level 3 institutions can manage fragile outpatients—those who call for some assistance with activities of daily living and/or require monthly clinical evaluations (e.g., oncology follow-ups, brittle diabetics, problematic asthmatics, or those with chronic conditions not well controlled with medication)—are classified Level 3. Finally, "inpatient" prisoners, those requiring daily nursing care, or

Def. Sent. Memo.

1  additional changes in the person's situation are not reasonably foreseeable and that the Court would be

2  willing to consider a sentence reduction in the future." Mr. Steever makes the request for the above

3  language so that the BOP could consider compassionate release should Mr. Steever's condition advance

4  to become either a terminal medical condition or an incurable and progressive illness that may result in

5  Mr. Steever not being able to care for himself.

6

7                                               Respectfully submitted,
                                                STEVEN G. KALAR
8                                               Federal Public Defender

9  Dated:  June 22, 2017                          /s/ Candis Mitchell
                                                CANDIS MITCHELL
10                                              Attorney for Defendant

11

12

13

14

15

16

17

18

19

20  those with intractable medical conditions are classified Level 4. Alan Ellis, BOP Designations Based on
    Medical Need. Criminal Justice, Vol. 23, No. 3 (2008) accessed at:
    https://www.americanbar.org/content/dam/aba/publishing/criminal_justice_section_newsletter/crimjus
21  t_cjmag_23_3_ellis.authcheckdam.pdf.

Def. Sent. Memo.
cr 14-00639 EMC                            17